IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. No. 1:16-cv-1336-EGS |
| | ) |
| FOOD AND DRUG ADMINISTRATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
APPLICATION FOR TEMPORARY RESTRAINING ORDER**

John M. Engel (D.C. Bar No. 443628)
ENGELNOVITT, PLLC
Suite 310
2401 Pennsylvania Ave. NW
Washington, DC  20037
(202) 207-3303 (tel)
(202) 207-3318 (fax)
jengel@engelnovitt.com

Timothy C. Hester (D.C. Bar No. 370707)
Michael S. Labson (D.C. Bar No. 447867)
Christopher N. Sipes (D.C. Bar No. 439294)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000 (Telephone)
(202) 662-6291 (Fax)

*Attorneys for Plaintiffs
AstraZeneca Pharmaceuticals LP and
iPR Pharmaceuticals, Inc.*

June 30, 2016

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. ii

GLOSSARY.... ............................................................................................................. iv

INTRODUCTION ........................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ............................................. 4

PROCEDURAL BACKGROUND ............................................................................... 8

    A.    FDA's Development of the 2015 Interpretation ................................... 8

    B.    The Significance of the 2015 Interpretation to This Litigation ........... 12

    C.    This Lawsuit................................................................................ 13

STATEMENT OF RELEVANT FACTS .................................................................... 15

ARGUMENT.............................................................................................................. 19

I.    This Case Is Ripe For Adjudication................................................................. 19

    A.    The Validity of FDA's 2015 Interpretation Is a Purely Legal Question That Is Fit for Immediate Review. ...................................... 20

    B.    FDA's 2015 Interpretation Is "Sufficiently Final" for Immediate Judicial Review. ............................................................................... 21

    C.    The Hardship Test Articulated in *Teva* Is Satisfied Here. ................. 22

    D.    Section 505(q) of the FDCA Does Not Preclude Judicial Review in These Circumstances. ......................................................... 23

II.    AstraZeneca Has a Substantial Likelihood of Success on the Merits.............. 25

    A.    The FDCA and FDA's Pediatric-Labeling Regulations Present a Barrier to Generic-Drug Approvals.................................................... 26

    B.    FDA Lacks Authority to Allow Carve Outs of Pediatric Labeling Protected by Orphan Drug Exclusivity. ............................... 27

        1.    Section 505A(*o*) Does Not Authorize Carve-Outs of Pediatric Labeling Protected by Orphan Drug Exclusivity.....................27

        2.    FDA's General Carve-Out Provisions Do Not Provide Authority to Carve Out AstraZeneca's Protected Labeling............................28

3.      Allowing a Carve-Out Based on the 2015 Interpretation Would Change the Treatment for Pediatric Orphan Drugs in a Way That Congress Has Not Authorized. .................................................................33

4.      The *Otsuka* Decisions Are Not Binding and Were Wrongly Decided. ....................................................................................................36

III.    AstraZeneca Will Likely Suffer Irreparable Harm in the Absence of Injunctive Relief. . 38

IV.     The Balance of Equities and the Public Interest Favor Granting Injunctive Relief.......... 42

CONCLUSION....................................................................................................................... 44

# GLOSSARY

| | |
|---|---|
| ANDA | Abbreviated New Drug Application |
| APA | Administrative Procedure Act, 5 U.S.C. § 706 |
| BMS | Bristol Myers Squibb |
| FDA | Defendant Food and Drug Administration |
| FDCA | Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–399f |
| General carve-out regulations | 21 C.F.R. §§ 314.92(a)(1), 314.94(a)(8)(iv), 314.127(a)(7) |
| HoFH | Homozygous familial hypercholesterolemia |
| Otsuka Letter | Letter from John R. Peters, M.D., Acting Director, Office of Generic Drugs, Center for Drug Evaluation and Research, to Ralph S. Tyler, Counsel for Otsuka Pharmaceuticals, Co. (Apr. 28, 2015) |
| *Otsuka I* | *Otsuka Pharmaceutical Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) |
| *Otsuka II* | *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 3442013 (D. Md. May 27, 2015) |
| Pediatric HoFH sNDA | AstraZeneca supplemental New Drug Application, No. 21-366/S-033 (July 27, 2015), seeking FDA approval for use of Crestor in treatment of pediatric HoFH patients |
| Pediatric HoFH Study | AstraZeneca, "A Randomized, Double-blind, Placebo-controlled, Multi-center, Cross-over Study of Rosuvastatin in Children and Adolescents (aged 6 to <18 years) with Homozygous Familial Hypercholesterolemia (HoFH)," No. D3561C00004 (2015) |
| Pediatric-labeling regulations | 21 C.F.R. §§ 201.57(c)(9)(iv)(B)–(C) |
| sNDA | Supplemental new drug application |
| Watson | Watson Laboratories, Inc. |

## INTRODUCTION

This suit challenges a policy adopted by the Food and Drug Administration ("FDA") in 2015 regarding the approval requirements for generic drugs. That policy ("the 2015 Interpretation") asserts authority to excuse generic drug manufacturers from taking a step that FDA's own regulations describe as mandatory. Specifically, the 2015 Interpretation concludes that FDA may waive compliance with the agency's pediatric-labeling regulations, 21 C.F.R. §§ 201.57(c)(9)(iv)(B)–(C), which state that a generic drug's label *must* include *all* of the information concerning treatment of pediatric patients that appears on the corresponding brand-name drug's label.

FDA adopted the 2015 Interpretation in a third-party adjudication, and the decision in that matter had no immediate bearing on AstraZeneca.

FDA is now poised to apply its 2015 Interpretation in a way that will irreparably harm AstraZeneca in just 9 days' time: FDA has tentatively approved multiple applications for generic versions of AstraZeneca's drug Crestor® (rosuvastatin calcium), and under the 2015 Interpretation final approval for several of those applications is an imminent threat on or about July 9, the day after expiration of a marketing exclusivity period not at issue in this suit. Those approvals will unleash a flood of generic Crestor products onto the market and will cause AstraZeneca to sustain an immediate and irreversible loss of approximately $400 million in net sales, as well as several other forms of irreparable harm.

None of this would be possible without the 2015 Interpretation's purported waiver of the pediatric-labeling regulations. On May 27, 2016, AstraZeneca obtained FDA approval for use of Crestor to treat pediatric patients ages 7 to 17 with homozygous familial hypercholesterolemia ("HoFH"), a rare disease that causes a rapid and life-threatening buildup in cholesterol levels. As a result of that approval, AstraZeneca obtained seven years of marketing exclusivity under the

Orphan Drug Act—a statute designed to incentivize the development of treatments for rare (or "orphan") diseases like HoFH. This exclusivity precludes FDA from approving a generic Crestor product labeled for treatment of pediatric HoFH patients until May 27, 2023. Because FDA's pediatric-labeling regulations state that generic drug labels *must* include *all* pediatric information that appears on the branded drug's label, AstraZeneca's orphan drug exclusivity operates as a broader bar on approval of *any* generic Crestor products—for any use or population—until the seven-year exclusivity period expires. Put differently, a generic drug could comply with the pediatric-labeling regulations only if it included information from Crestor's label regarding treatment of pediatric HoFH patients, but that information is protected by orphan drug exclusivity and therefore unavailable. A generic drug whose label simply omitted this information would violate the pediatric-labeling regulations and thus be misbranded and ineligible for sale under the Food, Drug, and Cosmetic Act ("FDCA").

FDA's 2015 Interpretation nevertheless claims authority to approve generic drug applications in this circumstance by permitting the manufacturer to "carve out" (i.e., omit) the protected pediatric information from the generic drug's label. But that policy is unlawful because none of the statutes or regulations that provide FDA with carve-out authority apply to pediatric labeling protected by orphan drug exclusivity. Section 505A(*o*) of the FDCA, 21 U.S.C. § 355a(*o*), permits carve outs of two *other* forms of pediatric labeling, but does not authorize the omission of labeling protected by the Orphan Drug Act. Nor is this carve out permitted by FDA's "general" carve-out regulations. *See, e.g.*, 21 C.F.R. § 314.94(a)(8)(iv). As FDA correctly concluded in a 2001 proceeding concerning the diabetes drug Glucophage, the general carve-out regulations do not apply because they were superseded by FDA's later-adopted and more specific pediatric-labeling regulations.

The 2015 Interpretation thus violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), in two separate ways. *First*, it departs without explanation from FDA's 2001 Glucophage decision. *Second*, the 2015 Interpretation's assertion that FDA may allow generic drug manufacturers to carve out pediatric labeling protected by orphan drug exclusivity is contrary to the FDCA's text, structure, purposes and history.

These claims are ripe for review and properly before the Court. As to ripeness, AstraZeneca's claims present pure questions of law regarding the validity of FDA's 2015 Interpretation. *See* Part I.A., *infra*. That Interpretation satisfies the finality requirement because FDA adopted it in an adjudication that concluded last year and adhered to it in a subsequent litigation. *See* Part I.B., *infra*. In addition, withholding judicial review would expose AstraZeneca to an imminent risk of severe hardship. *See* Part I.C., *infra*. Although FDA may contend that section 505(q)(2)(B) of the FDCA precludes review, that provision incorporates the traditional exceptions to the exhaustion requirement, including futility. *See* Part I.D., *infra*. The futility exception applies here because FDA made clear in the prior adjudication and litigation (*see* pp. 9–11, *infra*) that it will not reconsider the 2015 Interpretation.

Although AstraZeneca has repeatedly taken steps to avoid the need for immediate judicial review, FDA has rebuffed those efforts. In 2015, AstraZeneca requested priority review of its pediatric HoFH supplemental New Drug Application ("sNDA"). Had FDA granted that request—which met all agency requirements—there would have been ample time to resolve these claims before July 9. Nevertheless, FDA refused. Most recently, AstraZeneca reached out to FDA to propose a briefing schedule that would have provided adequate time to consider this suit prior to final FDA approval of additional generic Crestor products. FDA again refused.

The end result is that, absent immediate injunctive relief, AstraZeneca faces an imminent threat of severe and irreparable harm from application of FDA's unlawful 2015 Interpretation. Therefore, pursuant to Fed. R. Civ. P. 65, AstraZeneca seeks a temporary restraining order ("TRO") enjoining FDA from applying the 2015 Interpretation to the tentatively approved generic Crestor applications, pending a hearing on a motion for preliminary injunction and/or expedited review on the merits. This relief is intended to preserve the status quo and to preserve AstraZeneca's ability to obtain meaningful judicial review. *See* Fed. R. Civ. P. 65(a)(2); *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 201 (D.D.C. 2002), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004).

## STATUTORY AND REGULATORY BACKGROUND

This case involves the interplay of three aspects of the FDCA: labeling requirements, exclusivity provisions, and carve-out authorities.

*1. Labeling Requirements*. Under the FDCA, generic drugs generally must contain the same information on their labels as the corresponding brand-name predicate drug. *See* 21 U.S.C. §§ 355(j)(2)(A)(v), (j)(4)(G). This rule is known as the "same-labeling" requirement.

In 1994, FDA adopted pediatric-labeling regulations that supplement the same-labeling requirement, *see* 59 Fed. Reg. 64,240 (Dec. 13, 1994), and mandate that information pertaining to pediatric uses "must appear in *all* prescription drug labeling." 21 C.F.R. §§ 201.57(a), (a)(6)–(7), (a)(13), (c)(2)(i)(B), (c)(3)(i)(H) (emphasis added). FDA adopted these regulations in response to policy concerns that prescription medicines lacked adequate labeling for use in pediatric patients. *See, e.g.*, 59 Fed. Reg. at 64,240. The new pediatric-labeling mandate ensured that available information on the use of medicines in children would be included in all labeling of all prescription drugs. Thus, if there are "specific pediatric indication[s] different from those approved for adults," or "specific statements on pediatric use of the drug for an indication also

approved for adults," including pediatric dosage information, they *must* appear in the appropriate sections of the drug's labeling. 21 C.F.R. §§ 201.57(c)(9)(iv)(B)–(C). FDA has explained that "[a] drug product that is not in compliance with" these pediatric-labeling rules is "considered misbranded and an unapproved new drug under the [FDCA]." 59 Fed. Reg. at 64,247. And the FDCA prohibits the marketing of misbranded drugs. *See* 21 U.S.C. § 352(f).

Taken together, the FDCA's same-labeling requirement and FDA's pediatric-labeling regulations impose a categorical rule: a generic drug's label *must* include *all* pediatric information from the corresponding pioneer drug's label.

*2. Exclusivity Provisions.* Developing new drugs and treatments requires a significant investment of time and money. Today, the process of bringing a new "pioneer" drug to market takes on average 10 to 15 years from preclinical research through final FDA approval and costs nearly $2.6 billion.[1]

Federal law promotes the development of innovative new drugs and treatments by providing incentives for pioneer drug manufacturers to undertake these socially beneficial, but inherently risky, investments. *See, e.g.*, *Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 239 (D.D.C. 2002). Among these incentives are several forms of regulatory marketing exclusivity, which grant pioneer drugs protection from generic competition for a specified duration—thus ensuring that pioneer firms can recoup their significant research and development investments. Specifically, the FDCA provides: five years of exclusivity for new drugs, 21 U.S.C. § 355(j)(5)(F)(ii); three years of exclusivity for new indications for existing drugs and new

---

[1] *See* Tufts Center for the Study of Drug Development, *Cost to Develop and Win Marketing Approval for a New Drug is $2.6 Billion* (Nov. 18, 2014), http://csdd.tufts.edu/news/co-mplete_story/pr_tufts_csdd_2014_cost_study.

product formulations supported by clinical trials (also known as "three-year Hatch-Waxman exclusivity"), *id.* § 355(j)(5)(F)(iii)–(iv); and seven years of exclusivity for new indications that treat rare (or "orphan") diseases, *id.* § 360cc(a).

Seven-year orphan drug exclusivity, created in 1983 through enactment of the Orphan Drug Act, is the oldest of these non-patent exclusivities. *See* Pub. L. No. 97-414, § 527, 96 Stat. 2049, 2051 (1983). This statute was designed to encourage "the development of new 'orphan' treatments, diagnostics, and cures for the millions of Americans with rare diseases who did not have access to effective medicines because" it was not economical for manufacturers "to develop and market drugs for such small groups of patients." S. Rep. No. 107-129, at 1–2 (2001). When a pioneer drug manufacturer obtains orphan drug exclusivity for a given product, FDA "may not approve" another application "for such drug for such disease or condition" until after the seven-year exclusivity period expires. 21 U.S.C. § 360cc(a).

In some instances, the combination of the pediatric-labeling rules on the one hand, and the exclusivity provisions on the other, creates a scenario in which FDA cannot immediately approve generic drugs: The labeling rules require the generic drug's label to include all pediatric information from the pioneer drug's label, but when an exclusivity provision applies, some of the pioneer drug's labeling is protected and cannot be copied. If the generic drug's label omitted the protected information, the generic drug would violate the labeling rules and thus be misbranded.

*3. Carve-Out Authorities.* Several statutes and regulations permit generic manufacturers to avoid the delay in final approval by carving out (i.e., omitting) the pioneer drug's protected labeling in narrowly defined circumstances.

Congress has adopted two carve-out provisions relevant here. The first permits generic manufacturers to adopt labeling "changes required … because the [pioneer] drug and the listed

drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). In 1992, FDA adopted its "general" carve-out regulations based on this provision. *See* 57 Fed. Reg. 17,950, 17,984–86, 17,992 (Apr. 28, 1992). These regulations state, for example, that a generic drug label may omit "an indication or other aspect of labeling protected by patent or accorded exclusivity under [Hatch-Waxman]" so long as "such differences do not render the proposed drug product less safe or effective than the listed drug for all remaining, non-protected conditions of use." 21 C.F.R. § 314.94(a)(8)(iv); *see also id.* §§ 314.92(a)(1); 314.127(a)(7).

The second carve-out provision is section 505A(*o*) of the FDCA, 21 U.S.C. § 355a(*o*), enacted in 2002. Section 505A(*o*) provides in relevant part that a generic drug for which an Abbreviated New Drug Application ("ANDA") has been filed "shall not be considered ineligible for approval … or misbranded" because its labeling "omits a pediatric indication or any other aspect of labeling pertaining to pediatric use *when the omitted indication or other aspect is protected by patent or by exclusivity under [Hatch-Waxman]*." *Id.* § 355a(*o*)(1) (emphasis added).[2] In other words, section 505A(*o*) provides FDA with authority to override the pediatric labeling rules—which require *all* pediatric information to appear on a generic drug's label—in the limited circumstance where the pioneer drug's pediatric labeling is protected by patent exclusivity or three-year Hatch-Waxman exclusivity.

---

[2] Section 505A(*o*) also allows FDA to add a disclaimer to a generic drug's label (i) stating that "because of marketing exclusivity for [the pioneer] manufacturer," the generic "is not labeled for pediatric use" or a specific pediatric use, or (ii) reciting "any appropriate pediatric contraindications, warnings, precautions, or other information … necessary to assure safe use." 21 U.S.C. § 355a(*o*)(2).

## PROCEDURAL BACKGROUND

### A.  FDA's Development of the 2015 Interpretation

The FDA policy challenged in this suit—the 2015 Interpretation—concludes that the Agency has authority to allow generic manufacturers to carve out pediatric labeling protected by orphan drug exclusivity, notwithstanding the categorical language of FDA's pediatric-labeling regulations and the limited scope of section 505A(*o*). AstraZeneca seeks an order prohibiting FDA from applying its unlawful 2015 Interpretation to approve ANDAs for AstraZeneca's cholesterol drug Crestor (rosuvastatin calcium) on or about July 9, 2016.[3]

The relevant history begins with FDA's adjudication of several ANDAs filed with respect to Glucophage (metformin), a brand-name diabetes drug sold by Bristol Myers Squibb ("BMS"). *See* 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone). In 2000 and 2001, BMS obtained three-year Hatch-Waxman exclusivity with respect to a new indication for Glucophage regarding treatment of pediatric patients with type 2 diabetes. *See* 147 Cong. Rec. 10209 (Memorandum to the United States Congress Re: Proposed Amendment to the Hatch-Waxman Act (H.R. 2887)) (Dec. 18, 2001). BMS argued that, in combination with FDA's pediatric-labeling regulations, the three-year Hatch-Waxman protection resulted in *de facto* complete marketing exclusivity "for *all* users, not simply children, because all prescription drugs (including generics) were required by" the pediatric-labeling regulations "to include pediatric information in their labels." 147 Cong. Rec. H10209. Thus, BMS argued, FDA could not approve the Glucophage ANDAs for any patient population or indication, because labeling regulations required the pediatric diabetes information to be included, and BMS had sole

---

[3] An exclusivity period not at issue in this suit precludes FDA from granting final approval for Crestor ANDAs before July 9, 2016 (absent a license from AstraZeneca). *See* Declaration of Rod Wooten ("Wooten Decl.") (Exhibit A) ¶¶ 6–7.

ownership of that information due to its three-year Hatch-Waxman exclusivity. *See id.*; *see also id.* at H8105 (Nov. 13, 2001) (statement of Rep. Dingell).

FDA agreed. Although then-existing carve-out regulations authorized generic manufacturers to omit protected labeling in certain circumstances, *see, e.g.*, 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7), FDA concluded that these regulations did not apply to labeling subject to the agency's special pediatric-labeling regulations. FDA thus refused to approve the Glucophage ANDAs. *See* 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone); *Glucophage Generics Should Be Addressed by Congress, OGD's Buehler Says*, The Pink Sheet (Nov. 5, 2001).

Congress responded to FDA's ruling prohibiting approval of the Glucophage ANDAs by enacting new carve-out legislation in the Best Pharmaceuticals for Children Act. Pub. L. No. 107-109, 115 Stat. 1408 (2002). Specifically, Congress enacted section 505A(*o*), which, as described above, allows generic applicants to carve out pediatric indications "protected by patent or by [three-year Hatch-Waxman] exclusivity under" 21 U.S.C. § 355(j)(5)(F)(iii)–(iv). Following passage of the Best Pharmaceuticals for Children Act, FDA reversed course and approved the generic Glucophage ANDAs in January 2002, based on section 505A(*o*)'s new carve-out authority. *See Bristol Waives Glucophage Pediatric Exclusivity; Generics Will Re-Label*, The Pink Sheet (Feb. 4, 2002).

A related question arose more than a decade later with respect to Abilify (aripiprazole), an anti-schizophrenia drug marketed by Otsuka Pharmaceutical Co. ("Otsuka"). FDA first approved Abilify in 2002, and in 2014 approved Ability for treatment of pediatric patients ages 6 to 18 with Tourette's Syndrome. *See Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL

1962240, at *4 (D. Md. Apr. 29, 2015) (*Otsuka I*). FDA granted Otsuka seven years of orphan drug exclusivity with respect to the pediatric Tourette's Syndrome indication. *Id.*

In January 2015, Otsuka made the same argument as BMS with respect to Glucophage, except based on pediatric labeling protected by orphan exclusivity rather than Hatch-Waxman exclusivity. Specifically, Otsuka advised FDA that the combination of its orphan drug exclusivity and FDA's pediatric-labeling regulations entitled it to "a seven-year period of total market exclusivity (until December 2021)," during which "the law preclude[d] FDA from approving any generic version of Abilify® for *any* of its FDA-approved indications (absent a license from Otsuka)." *Id.* at *4 (emphasis in original). Otsuka also argued that FDA could not rely on section 505A(*o*) because that provision does not apply to pediatric labeling protected by orphan drug exclusivity.

FDA denied Otsuka's claim in a letter ruling dated April 28, 2015. *See* Letter from John R. Peters, M.D., Acting Director, Office of Generic Drugs, Center for Drug Evaluation and Research, to Ralph S. Tyler, Counsel for Otsuka Pharmaceuticals, Co. (Apr. 28, 2015) ("Otsuka Letter") (Exhibit B). The Otsuka Letter adopted an entirely new policy, creating an exception to the pediatric-labeling rules for ANDAs where the underlying branded drug has orphan drug exclusivity with respect to a pediatric indication. This new policy—the 2015 Interpretation—consists of two parts:

- *First*, FDA concluded as a threshold legal matter that it has authority under its general carve-out regulations, 21 C.F.R. §§ 314.92(a)(1), 314.94(a)(8)(iv), 314.127(a)(7), to "allow carve-outs of labeling"—including pediatric labeling—"protected by [orphan drug exclusivity]," Otsuka Letter at 13–14.

- *Second*, FDA concluded that a generic manufacturer may carve out pediatric labeling protected by orphan drug exclusivity *unless* (i) the corresponding brand-name drug "is approved in adults and pediatric patients for the same indication"; (ii) "the pediatric information is protected by exclusivity and is significantly different from the information regarding use in adults for the same indication"; and (iii) "a carve-out of

[the] pediatric information while the adult information is retained in the ANDA labeling may result in a potential safety risk to pediatric patients." *Id.* at 10 & n.27.

Applying the 2015 Interpretation to the generic Abilify ANDAs, FDA concluded that it had legal authority to allow a carve out of Otsuka's orphan-drug-protected pediatric Tourette's Syndrome labeling, and that such a carve out was appropriate because it would not present a safety risk under the second part of the 2015 Interpretation outlined above. *See id.* at 13–14.

Otsuka sought judicial review of the 2015 Interpretation in the United States District Court for the District of Maryland. *See Otsuka I*, 2015 WL 1962240, at *1. On April 15, 2015, Otsuka moved for a preliminary injunction or temporary restraining order prohibiting FDA from approving the generic Abilify ANDAs based on the 2015 Interpretation. *See id.* FDA approved the ANDAs at 1:15 pm on April 28, 2015. *Id.* Two hours later, the court held a hearing on Otsuka's motion for preliminary relief. *Id.* The following day, the court issued an unpublished memorandum opinion denying Otsuka's motion. *See id.* at *1, *5–13.

Otsuka thereafter filed a motion for summary judgment on the merits of its claim. *See Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 3442013, at *1 (D. Md. May 27, 2015) (*Otsuka II*). The court denied that motion and granted FDA's cross-motion for summary judgment, upholding FDA's 2015 Interpretation. *See id.* at *6–15.[4] Otsuka did not appeal.

---

[4] Throughout the *Otsuka* litigation, FDA adhered to its view that its general carve-out regulations authorize generic manufacturers to omit pediatric labeling protected by orphan drug exclusivity. *See, e.g.*, Federal Defendants' Mem. in Support of Motion for Summary Judgment, *Otsuka Pharm. Co. v. Burwell*, No. 8:15-cv-00852, ECF 109-1, at 24 (D. Md. filed May 11, 2015).

**B.  The Significance of the 2015 Interpretation to This Litigation**

The 2015 Interpretation bears directly on ten Crestor ANDAs for which FDA has granted tentative approval. *See* Wooten Decl. ¶ 11.[5] Specifically, under the 2015 Interpretation, FDA may grant final approval for Crestor ANDAs beginning on July 9, 2016, the day after expiration of a Crestor exclusivity period not at issue in this litigation. *See id.* ¶¶ 2, 7.[6] But the 2015 Interpretation is unlawful. FDA lacks authority to approve the Crestor ANDAs on July 9 because AstraZeneca has orphan drug exclusivity with respect to a Crestor pediatric indication.

AstraZeneca filed the sNDA that led to this grant of orphan drug exclusivity on July 27, 2015. *Id.* ¶ 9. The sNDA sought FDA approval for use of Crestor to treat pediatric patients with homozygous familial hypercholesterolemia ("HoFH"), a rare disease that causes substantially elevated plasma cholesterol levels and can (if left untreated) lead to cardiovascular disease, myocardial infarction (heart attacks), and premature death. *See* Declaration of Gregory Keenan, MD ("Keenan Decl.") (Exhibit C) ¶¶ 3–9, 16.

On May 27, 2016, FDA approved AstraZeneca's sNDA (the "Pediatric HoFH sNDA") and approved Crestor for treatment of pediatric HoFH patients ages 7 to 17. *Id.* Because FDA had previously designated HoFH as a rare "orphan" disease, FDA's approval of the Pediatric HoFH sNDA triggered a corresponding grant of seven years of exclusivity under the Orphan Drug Act. *Id.* ¶¶ 16–17. FDA confirmed this grant of exclusivity by letter dated June 3, 2016.

---

[5] A tentative approval signifies that, with the exception of the potential need for a final site inspection, an ANDA satisfies the requirements for final FDA approval and is eligible for marketing approval once any applicable exclusivities expire. *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010); *Ranbaxy Labs., Ltd v. Burwell*, 82 F. Supp. 3d 159, 168 n.9 (D.D.C. 2015).

[6] One generic version of Crestor is already on the market, pursuant to a license granted by AstraZeneca in resolution of a patent-infringement dispute. *See* Declaration of Sarah Walters ("Walters Decl.") (Exhibit D) ¶ 4. The status of that product is not at issue in this litigation.

Wooten Decl. ¶ 10. As a result of this orphan drug exclusivity, FDA may not approve another rosuvastatin calcium product labeled for treatment of pediatric HoFH patients ages 7 to 17 until May 27, 2023. *Id.* Because the pediatric-labeling regulations prohibit approval of generic Crestor products that omit the pediatric HoFH labeling, those products cannot be approved until the exclusivity period expires.

On May 31, 2016, two business days after FDA's approval of the Pediatric HoFH sNDA, AstraZeneca submitted a citizen petition to FDA concerning application of the 2015 Interpretation to the tentatively approved Crestor ANDAs. *See* Citizen Petition, No. FDA-2016-P-1485-0001 (Exhibit E).[7] In the citizen petition, AstraZeneca (like Otsuka) argued that the combination of its orphan drug exclusivity and FDA's pediatric-labeling rules precludes FDA from approving the Crestor ANDAs until after the orphan drug exclusivity period expires because (i) the 2015 Interpretation is facially invalid in light of FDA's pediatric-labeling regulations and the FDCA's text, structure and purposes; and (ii) even if the 2015 Interpretation were within FDA's authority, carving out Crestor's pediatric HoFH labeling would present a safety risk under the policy established by FDA in the 2015 Interpretation. *Id.* at 1–2. FDA has not ruled on AstraZeneca's citizen petition—though, as described below, FDA would have had more than the statutory maximum of 150 days in which to consider the citizen petition had FDA properly granted AstraZeneca's application for priority review of the Pediatric HoFH sNDA.

## C.  This Lawsuit

On June 27, 2016, AstraZeneca filed suit in this Court challenging FDA's 2015 Interpretation under the FDCA (21 U.S.C. §§ 301–399f), FDA's regulations implementing the

---

[7] At FDA's request, AstraZeneca filed a revised citizen petition on June 22, 2016. That petition is identical to the original, except for additional contact information on its final page.

FDCA, and the APA, 5 U.S.C. § 706. Complaint, ECF No. 1 ("Compl.") ¶¶ 1–8. The suit presents only the first claim asserted in AstraZeneca's citizen petition—that the 2015 Interpretation is unlawful because FDA lacks authority to carve out pediatric labeling protected by orphan drug exclusivity—because only that claim is ripe for judicial review. *See id.* ¶¶ 83–86; *see also infra* Part I (discussing ripeness). The Complaint does not include the separate and additional safety-based claim set forth in AstraZeneca's citizen petition, as that claim will not be ripe until FDA rules on the citizen petition or approves Crestor ANDAs in a way that constructively denies the petition. Compl. ¶ 83. The suit seeks a declaration that the 2015 Interpretation is unlawful and seeks an injunction precluding FDA from relying on the 2015 Interpretation to approve the Crestor ANDAs. *Id.* at 24–25 (Prayer for Relief).

The need for a TRO arises from the imminent threat that FDA will grant final approval of Crestor ANDAs on or about July 9, 2016. *See* Wooten Decl. ¶¶ 2, 7. FDA has tentatively approved ten ANDAs. *See id.* ¶¶ 11–13 & n.1. Final approval of the tentatively approved ANDAs is possible on or after July 9 *only* if FDA's 2015 Interpretation is lawful. But as outlined in AstraZeneca's Complaint and this Motion, the 2015 Interpretation is *not* lawful; indeed, it is directly at odds with the FDCA and FDA's implementing regulations. Under the correct reading of those provisions, FDA cannot approve any Crestor ANDAs (absent a license from AstraZeneca) until after the expiration of AstraZeneca's pediatric HoFH orphan drug exclusivity period. As set forth in Part III below, AstraZeneca will suffer significant and irreparable harm if FDA unlawfully approves the Crestor ANDAs prior to resolution of the merits of this suit.

Immediate injunctive relief preserving the status quo is therefore imperative to provide for judicial review of FDA's 2015 Interpretation before AstraZeneca suffers severe and irreparable injury from FDA's reliance on that Interpretation. Without a TRO, AstraZeneca will

have no meaningful opportunity to secure review of its legal claim—that it holds an exclusivity right precluding generic entry—before suffering several forms of significant and irreparable harm.

## STATEMENT OF RELEVANT FACTS

1.      AstraZeneca holds a New Drug Application ("NDA") for Crestor (rosuvastatin calcium), which was first approved in the United States in 2003 for treatment of dyslipidemia. Crestor's active ingredient, rosuvastatin, is an inhibitor of synthetic 3-hydroxy-3-methylglutaryl coenzyme A ("HMG CoA") reductase, the rate-limiting enzyme that converts HMG-CoA to mevalonate, a precursor of cholesterol. Keenan Decl. ¶ 10. Clinical testing has shown that Crestor favorably modifies plasma levels of lipids, lipoproteins, and their ratios—thereby reducing harmful cholesterol levels. *Id.*

2.      HoFH is a rare and serious inherited disorder for patients with significantly reduced functional low-density lipoprotein ("LDL") receptors and other abnormalities. Reduced receptor-mediated catabolism of LDL causes a patient's cholesterol level to increase rapidly, often leading to premature coronary artery disease, myocardial infarction (heart attack), and death. Keenan Decl. ¶ 3. In children, HoFH causes the accumulation of cholesterol beginning at birth and produces increasingly severe clinical manifestations. The signs and symptoms of HoFH in children are severe, and include peripheral vascular disease, cerebrovascular disease, coronary artery disease, tendonitis, and aortic stenosis. *Id.* ¶ 4.

3.      AstraZeneca obtained orphan drug designation for use of Crestor in treating pediatric HoFH patients in 2014. Keenan Decl. ¶ 17. Thereafter, AstraZeneca initiated a clinical trial regarding use of Crestor to treat pediatric HoFH patients. Keenan Decl. ¶¶ 10–15. This clinical trial (the "Pediatric HoFH Study") concluded in 2015 and established that Crestor 20 mg is a safe and effective treatment for pediatric HoFH patients ages 7 to 17. *Id.* ¶ 16.

4.      On July 27, 2015, based on the Pediatric HoFH Study and other data, AstraZeneca submitted the Pediatric HoFH sNDA, which sought FDA approval for use of Crestor to treat pediatric HoFH patients. Wooten Decl. ¶ 9. AstraZeneca took several steps to expedite FDA's review of the Pediatric HoFH sNDA, including by: (i) filing a request for priority review that fully met all FDA-required criteria; (ii) filing a detailed request for reconsideration when FDA denied the request for priority review; (iii) requesting that FDA review the Pediatric HoFH sNDA on an expedited basis through the standard review process; and (iv) following up with FDA on several occasions regarding the Pediatric HoFH sNDA. Keenan Decl. ¶ 18. Despite these efforts, FDA did not expedite consideration of the Pediatric HoFH sNDA. *Id.* (By contrast, FDA granted priority review of AstraZeneca's sNDA regarding use of Crestor to treat pediatric patients with heterozygous familial hypercholesterolemia ("HeFH"), a related but less serious disease.) Had FDA followed its own criteria and granted priority review, the agency would have had more than 150 days to review and rule on AstraZeneca's citizen petition prior to July 9, 2016. Compl. ¶ 70.[8]

5.      On May 27, 2016, FDA approved the Pediatric HoFH sNDA and approved Crestor "for treatment of pediatric patients 7 to 17 years of age with homozygous familial hypercholesterolemia (HoFH)." Keenan Decl. ¶ 16 & Ex. 1.

6.      Approval of AstraZeneca's Pediatric HoFH sNDA triggered a grant of orphan drug exclusivity for Crestor with respect to treatment of pediatric HoFH. *Id.* ¶ 17. This exclusivity period began on May 27, 2016, and ends seven years later on May 27, 2023. *Id.* As a result of this orphan drug exclusivity, FDA may not approve another rosuvastatin calcium

---

[8] 150 days is the maximum time period for FDA review of citizen petitions. *See* 21 U.S.C. § 355(q)(1)(F).

product labeled for treatment of pediatric HoFH patients until May 27, 2023. Wooten Decl. ¶ 10. Because the pediatric-labeling regulations prohibit approval of generic Crestor products that omit the pediatric HoFH labeling, those products cannot be approved until that time.

7.      In 2013, in connection with resolution of an unrelated patent-infringement dispute, AstraZeneca granted Watson Laboratories, Inc. ("Watson") a license to market generic Crestor products. *See* Walters Decl. ¶ 3. Watson obtained final FDA approval of a generic Crestor product in April 2016 and, pursuant to the settlement agreement with AstraZeneca, began marketing that product on or about May 2, 2016. *See id.* ¶ 4. AstraZeneca subsequently granted Watson a waiver of its orphan-drug exclusivity for the pediatric HoFH labeling. *Id.* ¶ 7.

8.      Apart from Watson's generic Crestor product, FDA has tentatively approved ten other Crestor ANDAs. Wooten Decl. ¶ 11 & Ex. 2. None of these ANDAs has received final FDA approval. *Id.*

9.      On May 31, 2016, AstraZeneca submitted a citizen petition to FDA concerning application of the 2015 Interpretation to the tentatively approved Crestor ANDAs. *See* Citizen Petition, Ex. E. The citizen petition argues that FDA's 2015 Interpretation is unlawful on its face because FDA lacks authority to carve out pediatric labeling protected by orphan drug exclusivity. *See id.* at 17–26. The citizen petition also makes a separate argument that, even if the 2015 Interpretation were valid, FDA nevertheless lacks authority to approve the Crestor ANDAs because carving out AstraZeneca's proprietary pediatric HoFH labeling would present the very type of significant safety risk that FDA identified in its 2015 Interpretation as a basis for not allowing generic products to carve out protected pediatric labeling. *Id.* at 11–17. FDA has not ruled on the citizen petition.

10.    Crestor U.S. sales in 2015 were $2.844 billion, making Crestor one of AstraZeneca's top revenue drivers. Wooten Decl. ¶ 13. Crestor U.S. sales in the first quarter of 2016 were $636 million, and are projected to be, absent additional generic entry, $1.6 billion by year's end. *Id.*

11.    Based on AstraZeneca's experience with sales erosion that occurs when multiple generics enter the market, if FDA grants final approval for multiple Crestor ANDAs on or about July 9, AstraZeneca will experience an immediate loss of Crestor net sales in the range of $400 million. *Id.* ¶¶ 14–22. This immediate loss would be irreversible, because generic drug manufacturers typically flood the market with approximately six months' worth of supply within hours or days of receiving final FDA approval. *Id.* ¶¶ 15, 18–21. Even if AstraZeneca later prevailed on the merits, it would be unable to recover these immediate losses from FDA, or to remove the large supply of prematurely approved generic Crestor products from pharmacy shelves. *Id.* ¶¶ 15–18, 31.

12.    The immediate and irreversible loss of $400 million in Crestor net sales would have a severe and long-term impact on AstraZeneca. Among other things, the loss would lead to job cuts and cause AstraZeneca to forgo approximately $100 million in research and development operations. *Id.* ¶¶ 22, 29. This reduction would require AstraZeneca to decline options for clinical research, the value of which is impossible to calculate ex ante. For example, had AstraZeneca's research budget been cut by $100 million while AstraZeneca was studying a new anesthetic drug called Omeprazole, AstraZeneca may have discontinued the study, which ultimately led to discovery of Prilosec®—the most-recommended heartburn treatment in the United States. *Id.* ¶ 30.

–18–

**ARGUMENT**

This Court should grant a temporary restraining order that, pending a hearing on a request for preliminary injunction (or expedited merits hearing, *see* Fed. R. Civ. P. 65(a)(2)), bars FDA from granting final approvals for generic Crestor products based on the 2015 Interpretation. Such relief is necessary to preserve the status quo and to allow a fair opportunity for judicial review of FDA's 2015 Interpretation. Without a temporary restraining order, AstraZeneca will likely have no realistic opportunity for judicial review of its claims because its exclusivity rights will have been rendered worthless in a matter of days after FDA approves multiple generic versions of Crestor. AstraZeneca therefore seeks immediate injunctive relief for the limited purpose of "preserv[ing] the relative positions of the parties until … the merits" can be reached. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).[9]

## I.      This Case Is Ripe For Adjudication.

This case meets all the ripeness requirements for immediate adjudication. The ripeness inquiry turns on two considerations: (i) whether the matter is "fi[t] for review of the legal issue presented"; and (ii) whether "the hardship to the parties of withholding court consideration" requires review prior to enforcement. *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 (D.C. Cir. 2010). The fitness prong examines "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (citation omitted). The hardship prong aims to determine

---

[9] In determining whether to issue a TRO, this Court considers four well-established factors: (1) whether there is a substantial likelihood that the plaintiff will prevail on the merits; (2) whether the plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) the hardship to the defendants if the preliminary injunction is granted, balanced against the hardship to the plaintiff if the preliminary injunction is not granted; and (4) whether the public interest favors granting the preliminary relief requested. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008)).

"whether *postponing* judicial review would impose an undue burden on the parties." *Id*. at 1310

(citation omitted). Courts apply a "presumption of reviewability" when assessing these factors.

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986).

### A. The Validity of FDA's 2015 Interpretation Is a Purely Legal Question That Is Fit for Immediate Review.

Suits presenting "purely legal" claims are generally fit for judicial review. *See Teva*, 595

F.3d at 1308; *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 114 (D.D.C.

2014). Cases, such as this one, that turn on the proper interpretation of statutes and regulations

fall within this "purely legal" category.

*Teva* is a case in point. There, a drug manufacturer (Teva) believed that it was entitled to

an 180-day exclusivity period, during which "additional firms" could not "lawfully enter the

market." 595 F.3d at 1311. However, FDA had twice issued decisions that would have precluded

Teva from obtaining its claimed exclusivity. *Id.* at 1304–07. Both of those decisions involved

parties other than Teva, and in both cases FDA successfully defended its position in federal

district court. *Id.* at 1307. Teva sued FDA, asserting that "the agency's interpretation" of the

exclusivity provisions would improperly deprive Teva of "a valuable asset." *Id.* at 1304–05,

1311. This claim was purely legal—and so fit for review—because it "turn[ed] on questions of

statutory construction," and "the interpretations chosen by the FDA and proposed by Teva both

constitute[d] bright-line rules." *Id.* at 1308–09.

Here, as in *Teva*, AstraZeneca is raising a purely legal question: whether FDA has

authority to carve out pediatric labeling protected by orphan drug exclusivity. The answer to that

question turns on the proper construction of the FDCA and FDA's regulations. Both FDA and

AstraZeneca advocate for a "bright-line" rule: either FDA has carve-out authority, as the 2015

Interpretation asserts, or FDA does not, as AstraZeneca contends.

**B. FDA's 2015 Interpretation Is "Sufficiently Final" for Immediate Judicial Review.**

The second aspect of the fitness analysis is whether the challenged policy is "sufficiently final." *Id.* at 1308. This issue turns on "whether the FDA actually has a policy, whether it's clear what will happen when the FDA applies the policy" and "whether in any event it's sufficiently likely that the policy will matter at all, given possible uncertaint[ies]." *Id.* at 1309.

Applying that framework, the court held that the FDA policy challenged in *Teva* was sufficiently final, even though Teva sued FDA long before FDA determined whether Teva was entitled to the claimed exclusivity, and even though "FDA could in principle [have] change[d] its position." *Id.* at 1304–05, 1309. The "mere theoretical possibility that" FDA "could alter its views on" the exclusivity question did not "preclud[e] pre-enforcement review" because there was "virtually no doubt, as a practical matter, what approach the agency w[ould] apply to Teva." *Id.* at 1309. Given FDA's prior rulings, any argument that a different rule should have applied to Teva's exclusivity claim would have been "plainly futile." *Id.*

In reaching these conclusions, the court rejected the government's argument that Teva's claim was premature because FDA's "challenged interpretation may not be dispositive of the question whether Teva ultimately deserves exclusivity." *Id.* While FDA insisted that future contingencies might *independently* bar Teva from obtaining relief, these contingencies did not alter the ripeness analysis because resolution of Teva's claim would "almost certainly [have] determine[d] whether Teva [wa]s entitled to the exclusivity it claim[ed]." *Id.* at 1309–10.

As in *Teva*, there are no facts relevant to FDA's 2015 Interpretation that are in dispute, and waiting for FDA to apply that Interpretation to the Crestor ANDAs would not advance the threshold legal question: whether FDA has authority to carve out pediatric labeling protected by orphan drug exclusivity. FDA clearly articulated its position in the *Otsuka* proceedings, and the 2015 Interpretation adopted in the course of those proceedings "will almost certainly determine

whether [AstraZeneca] is entitled to the exclusivity it claims." *Id.* To the extent the FDA contests the ripeness of this case by arguing that the dispute is "contingent [on] future events," it is "challenging the ripeness of the wrong clai[m]." *Farm-to-Consumer Legal Defense Fund v. Sebelius*, 734 F. Supp. 2d 668, 694 (N.D. Iowa 2010).

### C. The Hardship Test Articulated in *Teva* Is Satisfied Here.

This case is ripe for immediate review because postponing judicial proceedings would cause AstraZeneca to suffer significant and irremediable hardship.

*Teva* once again provides the relevant framework. There, the court explained that courts must assume that the plaintiff "is right on the merits" in evaluating hardship. 595 F.3d at 1311. Acting on that assumption, the court noted that Teva would "be entitled to start enjoying its exclusivity period" (and to market its drug "before additional firms lawfully enter[ed] the market") if the court adopted its reading of the FDCA. *Id.* That exclusivity was "a valuable asset," "the loss of [which]" would likely have resulted in "a 'severe economic impact.'" *Id.* (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998)). If the court postponed review, "Teva would almost certainly [have] face[d] competition from" other parties—"an injury that would not be remedied by Teva's securing … exclusivity later on." *Id.*

The same considerations apply here. Accepting AstraZeneca's interpretation of the governing regulations, FDA may not approve Crestor ANDAs until after the pediatric HoFH orphan drug exclusivity period expires, in May 2023. Failure to adjudicate AstraZeneca's claim now will almost certainly lead to the entry of generic competition that otherwise would be barred—thus causing AstraZeneca to suffer immediate, irreparable and substantial harm. *See* Part III, *infra*. As in *Teva*, that harm would not be remedied if the Court later held that FDA's 2015 Interpretation is invalid, because sovereign immunity shields FDA from liability for damages, generic companies will likely have already flooded the market with a substantial

amount of generic Crestor, and AstraZeneca cannot pursue claims against those companies for violations of the FDCA. Wooten Decl. ¶¶ 14, 16–21. Even if many months later the Court were to bar further sales of the generic Crestor products, AstraZeneca still would suffer irreparable harm because of substantial lost sales it would suffer before the unlawfully approved generics were removed from the market.

Regardless, hardship is not the "*sine qua non* of ripeness." *Teva*, 595 F.3d at 1310. Because FDA has "no institutional interests favoring postponement of review," AstraZeneca "need not satisfy the hardship prong." *Id.* (quotation marks omitted). Thus, the court "need not" resolve the hardship question because AstraZeneca "faces at least one harm from a delayed judicial review cognizable in the ripeness analysis: a near-certain loss of the [exclusivity] advantage to which the company claims entitlement." *Id.*

## D. Section 505(q) of the FDCA Does Not Preclude Judicial Review in These Circumstances.

Section 505(q)(2)(B), 21 U.S.C. § 355(q)(2)(B), provides that "[i]f a civil action is filed against [FDA] with respect to any issue raised in [a citizen] petition before [FDA] has taken final agency action on the petition … the court shall dismiss without prejudice the action for failure to exhaust administrative remedies." *Id.*

This language codifies "the general requirement of exhaustion of administrative remedies" and hence "incorporate[s] the traditionally recognized exceptions to the exhaustion doctrine." *Wash. Ass'n for Telev. & Children v. FCC*, 712 F.2d 677, 681–82 (D.C. Cir. 1983) (*WATCH*). Those exceptions allow review of unexhausted claims where it "would have been futile" to adjudicate them "before the agency," *Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996), and where "delaying judicial review would cause irreparable injury," *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 159 (D.C. Cir. 2007). Courts routinely apply these

exceptions to statutes worded similarly to section 505(q)(2)(B). *See WATCH*, 712 F.2d at 681 (addressing 47 U.S.C. § 405, which imposes "a condition precedent to judicial review" of certain claims); *see also Air One Helicopters, Inc. v. FAA*, 86 F.3d 880, 882 (9th Cir. 1996).

The logic of the D.C. Circuit's *Teva* decision provides further support for this view. As *Teva* explained, "[d]istrict courts in this circuit routinely reach the merits" of exclusivity disputes "before the FDA has granted final approval to any ANDA." 595 F.3d at 1311. This policy "makes good sense," because the "alternative approach—delaying review until the agency has made its technically tentative decisions final—puts a court in an awkward bind, unless it miraculously manages to resolve the merits issue more or less instantaneously." *Id.* Consistent with the reasoning of *Teva*, the court here confronts a circumstance where dismissal on ripeness grounds would put a court "in an awkward bind" because it would be unable to act on a legal claim until it is too late to vindicate the claim. Indeed, if the Court "refrained from adjudicating this dispute now," there is an imminent prospect that FDA will approve multiple generics before AstraZeneca is able to secure judicial review of its claim—thus inflicting "an injury that would not be remedied" by restoration of AstraZeneca's "exclusivity later on." *Id.*

Because it would be "plainly futile" for AstraZeneca to adjudicate its challenge to the 2015 Interpretation before FDA, *id.*, section 505(q)(2)(B) does not foreclose immediate judicial review. It would be illogical to preclude judicial review of a claimed violation of law by FDA until after it is too late for that review to be of any consequence.[10]

---

[10] Alternatively, the imminent threat of generic approvals on or about July 9, combined with FDA's refusal to provide for orderly pre-approval briefing, indicates that the Court should retain jurisdiction, preserve the status quo, and rule on this Motion if and when FDA rejects AstraZeneca's position by approving the Crestor ANDAs on or about July 9.

## II.     AstraZeneca Has a Substantial Likelihood of Success on the Merits.

FDA's 2015 Interpretation violates the FDCA and FDA's implementing regulations. The APA, 5 U.S.C. § 706(2)(A), instructs that a reviewing court must "hold unlawful and set aside agency action" when—as in this case—it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

AstraZeneca has a substantial prospect of prevailing on the merits under this standard. As discussed more fully below, FDA lacks authority to carve out pediatric labeling protected by orphan drug exclusivity. This conclusion follows from the FDCA's same-labeling requirement and FDA's pediatric-labeling regulations, which together impose a categorical rule: generic drug labels *must* include *all* pediatric information appearing on the pioneer drug's label. None of FDA's carve-out authorities overrides this rule with respect to pediatric labeling protected by orphan drug exclusivity. Section 505A(*o*) permits the carve out of labeling protected only by patent and Hatch-Waxman exclusivity, and FDA's general carve-out authorities are inapposite in light of the later-adopted pediatric-labeling rules. Indeed, prior to section 505A(*o*)'s passage, FDA concluded that it lacked authority under its general carve-out regulations to approve generic Glucophage ANDAs in circumstances materially identical to those presented here.

FDA's 2015 Interpretation ignores these points. That interpretation is arbitrary and capricious because it marks a sudden and unexplained departure from the one FDA adopted in adjudicating the Glucophage ANDAs, and because it is contrary to the text, structure, purposes, and history of the FDCA; FDA's pediatric-labeling regulations; and Congress's decision not to include orphan drug exclusivity in section 505A(*o*).

**A. The FDCA and FDA's Pediatric-Labeling Regulations Present a Barrier to Generic-Drug Approvals.**

FDA's pediatric-labeling regulations state that a generic drug's label "must" include whatever pediatric information appears on the corresponding pioneer drug's label. 21 C.F.R. §§ 201.57(c)(9)(iv)(B)–(C); *id.* § 201.57(a) (pediatric information described in 21 C.F.R. §§ 201.57(a)(6)–(7), (a)(13), (c)(2)(i)(B) "must appear in *all* prescription drug labeling" (emphasis added)). By using the word "must," the labeling regulations "impose" a "mandatory duty." *See, e.g.*, *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016).

The pediatric-labeling rules thus create a barrier to approval of a generic drug when (i) a pioneer drug is approved for one or more pediatric indications and (ii) at least one of those pediatric indications is protected by some form of exclusivity. In the absence of an applicable carve-out provision, FDA cannot immediately approve the generic application because the labeling rules require the generic to include pediatric labeling that is protected by exclusivity and thus unavailable. If the generic carved out the protected labeling, it would be considered misbranded under the pediatric-labeling rules. *See* 59 Fed. Reg. at 64,247. And the FDCA prohibits the sale of misbranded drugs. *See* 21 U.S.C. § 352(f).

This was the scenario presented in the Glucophage precedent. At the time, "the *only* obstacle" to approval of the generic Glucophage ANDAs was, what critics referred to as, a "loophole in the Waxman-Hatch [Act]," which provided total exclusivity whenever the sponsor of a pioneer drug obtained exclusivity with respect to one or more pediatric indications. 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone) (emphasis added). "FDA's Office of Generic Drugs" was "unable to allow … generics onto the market due to" the pediatric-labeling regulations. *Id.* A memorandum in the *Congressional Record*—which FDA cited and relied upon in the 2015 Interpretation, *see* Otsuka Letter, Ex. B, at 10 n.27—explained that:

> The FDA approved such labeling and granted BMS three years of pediatric labeling exclusivity as provided under the law. Under existing law and regulations, the grant of labeling exclusivity amounted to a grant of marketing exclusivity for Glucophage for *all* users, not simply children, because *all* prescription drugs (including generics) were required by FDA regulations promulgated in 1994 to include pediatric information in their labels.

147 Cong. Rec. H10209 (Dec. 18, 2001) (emphases added). FDA agreed with this interpretation and declined to approve the Glucophage ANDAs for that reason. *See, e.g.*, *id.* at H8551 (statement of Rep. Pallone).

The upshot is that, under the plain text of the pediatric-labeling regulations and FDA's original interpretation of those regulations, pediatric labeling protected by exclusivity may not be omitted from a generic drug's label unless expressly permitted by a carve-out provision.

**B. FDA Lacks Authority to Allow Carve Outs of Pediatric Labeling Protected by Orphan Drug Exclusivity.**

The 2015 Interpretation is invalid because it allows carve outs in a scenario where no statutory or regulatory carve-out provision applies. Section 505A(*o*) does not speak to pediatric labeling protected by orphan drug exclusivity, so it cannot provide the basis for the 2015 Interpretation. And FDA's general carve-out regulations do not fill that void either, because FDA concluded that they are superseded by FDA's later-adopted pediatric-labeling regulations, and because allowing a carve out would contravene the policy adopted by the FDCA's text, structure and purposes. For all of these reasons, the 2015 Interpretation is unlawful.

**1. Section 505A(*o*) Does Not Authorize Carve-Outs of Pediatric Labeling Protected by Orphan Drug Exclusivity.**

By its plain terms, section 505A(*o*) applies to pediatric labeling protected only by patent and three-year Hatch-Waxman exclusivity. It states that a generic drug label may "omi[t] a pediatric indication or any other aspect of labeling pertaining to pediatric use *when the omitted indication or other aspect is protected by patent or by exclusivity under [21 U.S.C.*

–27–

*§ 355(j)(5)(F)(iii)–(iv)*]." 21 U.S.C. § 355a(*o*)(1) (emphasis added). Hence, when pediatric labeling is protected by a form of exclusivity other than patent exclusivity or three-year Hatch-Waxman exclusivity, section 505A(*o*) does not apply.[11]

FDA has consistently read section 505A(*o*) according to its plain terms. For example, immediately following the Best Pharmaceuticals for Children Act's passage, FDA stated in response to a citizen petition filed by BMS that section 505A(*o*) addresses pediatric labeling only protected by "patent exclusivity" or "3-year exclusivity under [21 U.S.C. 355(j)(5)(F)(iii)–(iv)]." Letter from Dennis E. Baker, Associate Commissioner for Regulatory Affairs, to C. Boyden Gray, Wilmer Cutler & Pickering, No. 01P-0586/CP1, at 1 & n.2 (Jan. 24, 2002).

Because section 505A(*o*) does not address exclusivity afforded by the Orphan Drug Act, the barrier to generic-drug approvals presented in the Glucophage precedent remains with respect to the special case of pediatric labeling protected by orphan drug exclusivity. To the extent the 2015 Interpretation relies on section 505A(*o*), that rationale is contrary to the statutory text and invalid. *See Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

## 2. FDA's General Carve-Out Provisions Do Not Provide Authority to Carve Out AstraZeneca's Protected Labeling.

Although FDA's 2015 Interpretation relies on the agency's general carve-out authorities, those authorities are inapplicable to pediatric labeling protected by orphan drug exclusivity, and the 2015 Interpretation is therefore invalid.

---

[11] This limited scope is also clear from section 505A(*o*)'s legislative history. Congress enacted section 505A(*o*) to close the Glucophage "loophole." *See* 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone). Glucophage was covered by three-year Hatch-Waxman exclusivity, but was *not* protected by orphan drug exclusivity.

FDA addressed and decided this question when it adjudicated the Glucophage ANDAs in 2001. Although FDA's general carve-out regulations were adopted in 1992, *see* 57 Fed. Reg. 17,950, 17,984–86, 17,992 (Apr. 28, 1992), nine years before the Glucophage matter, FDA nevertheless understood that they did not allow a carve-out of BMS's protected pediatric labeling. Specifically, "FDA's Office of Generic Drugs" concluded that it was "unable to allow … generics onto the market due to" the pediatric-labeling regulations. 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone); *see also id.* H10209 (Dec. 18, 2001). Because of this conclusion, Congress determined that an entirely new carve-out authority was necessary— section 505A(*o*) (which, as described above, does not apply here).

FDA's refusal to rely on its general carve-out regulations was well founded, because those regulations (adopted in 1992) were superseded by the pediatric-labeling regulations, adopted two years later in 1994. *See* 59 Fed. Reg. 64,240 (Dec. 13, 1994). When regulations conflict, "the earlier regulation should give way to the later in time." *Maceren v. INS*, 509 F.2d 934, 941 (9th Cir. 1974). Here, the regulations are in clear conflict because otherwise the earlier carve-out rules would grant permission to do something that the later-in-time pediatric-labeling rules expressly prohibit: omit pediatric information from a generic drug's label. Hence, the pediatric-labeling regulations govern. This conclusion is further supported by the rule "that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012). Whereas FDA's 1992 regulations provide a generalized rule for carve outs, the 1994 labeling regulations speak specifically and directly to whether pediatric information

may be omitted, and answer that question with a categorical "no." Thus, the latter regulations control.[12]

The *Congressional Record* memorandum—which FDA itself has held out as correctly documenting the agency's decisionmaking, *see* Otsuka Letter, Ex. B, at 10 n.27—makes the same point. It states that, "[i]n 1994, the FDA created an exception to" the agency's regulations "concerning acceptable label omissions" by adopting the pediatric-labeling rules. 147 Cong. Rec. H10209 (Dec. 18, 2001). This exception "afford[ed] pioneer drug manufacturers extended *total marketing exclusivity* based on the development of new pediatric use indications," because under the "regulations requiring that pediatric information be included in the labeling of every prescription drug" a carve out would cause the generic drug to "be considered to be misbranded and an unapproved new drug." *Id.* (emphasis added; citations and quotation marks omitted). The memorandum also concluded that BMS's Hatch-Waxman exclusivity "resulted in total marketing exclusivity with respect to Glucophage for the applicable [three-year] period because BMS has acquired exclusive rights to the only pediatric use indication that applied under the pediatric labeling requirements." *Id.* at H10210. FDA adhered to this view and thus refused to approve the Glucophage ANDAs until *after* section 505A(*o*) was enacted. *See Bristol Waives Glucophage Pediatric Exclusivity; Generics Will Re-Label*, The Pink Sheet (Feb. 4, 2002).

---

[12] To the extent FDA reads its regulations differently, FDA's interpretation is erroneous. *Auer* deference does not apply because FDA's pediatric-labeling regulations are unambiguous, *see Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous"), and because the 2015 Interpretation "conflicts with" FDA's "prior interpretation" in the Glucophage matter, *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012). Even if *Auer* did apply, an interpretation of the regulations that allowed a carve out here would be "plainly erroneous or inconsistent with the regulation[s]," for the reasons given above. *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

Were FDA's general carve-out authorities sufficient, section 505A(*o*) would have been unnecessary. It is black-letter law that courts "should not assume the legislature passed a statute without effect." *Williams v. Vermont*, 472 U.S. 14, 21 n.6 (1985). Here, there is particularly compelling evidence to support the application of that interpretive canon. The record is replete with evidence that Congress believed that a "loophole" existed, and that new legislation was necessary to close it. *See, e.g.*, 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone) ("[T]here is currently a legislative fix … that would close this loophole and allow generic versions of this diabetes drug to compete with Bristol's Glucophage."); *id.* at H10210 (Dec. 18, 2001) (statement of Rep. Eshoo) ("[T]he bill … closes the 'Glucophage loophole' which allowed one company to get an additional 3 years of marketing exclusivity.").

FDA's 2015 Interpretation relies on the notion that all of these statements were in error, and that no loophole existed, because FDA *could* have approved the Glucophage ANDAs based on its general carve-out power. *See* Otsuka Letter, Ex. B, at 13–14. That argument is revisionist history, for the reasons given above. It also violates the APA's duty of reasoned decisionmaking. At no point did FDA "display awareness that it is changing position" from the interpretation adopted in the Glucophage matter. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (quotation marks omitted). Nor does the 2015 Interpretation explain why FDA chose to jettison the interpretation it adopted in adjudicating the Glucophage ANDAs.

Federal agencies "are free to change course … but when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Ramaprakash v. FAA*, 346 F.3d 1121, 1124–25 (D.C. Cir. 2003) (quotation marks omitted). The 2015 Interpretation violates that rule because it marks a sharp departure from the FDA's past practice, without providing a reasoned explanation for the change.

Similarly, to the extent FDA now asserts that the problem posed in the Glucophage precedent was not a legal inability to carve out protected pediatric information, but rather an inability to do so only when a carve out would present a safety risk, *see* Otsuka Letter, Ex. B, at 10 n.27, FDA mischaracterizes its prior actions. The Glucophage problem was the product of the pediatric-labeling requirements and not a fact-based safety analysis: "There are no patents blocking the approval of [the Glucophage] generics in this case. The only obstacle is a … loophole in the Waxman-Hatch exclusivity." 147 Cong. Rec. H8551 (Nov. 28, 2001) (statement of Rep. Pallone).[13]

Simply put, there is no evidence that FDA denied the Glucophage ANDAs based on case-specific safety concerns. The absence of such evidence reinforces that the 2015 Interpretation represents not an *application* of the Glucophage precedent, as FDA now asserts, but rather a *departure* from that precedent. And because the 2015 Interpretation does not acknowledge that departure, much less provide a reasoned explanation for it, the 2015 Interpretation fails the APA's minimum rationality threshold. *See Ramaprakash*, 346 F.3d at 1124–25.

---

[13] Contemporaneous press coverage likewise documents FDA's conclusion that it lacked authority to allow a carve out, without regard to case-specific safety questions. *See FDA Discontinued Label Guidance on Hold*, The Pink Sheet (Apr. 8, 2002) (FDA placed "on hold" approval of the Glucophage ANDAs "because of Waxman/Hatch exclusivity for pediatric labeling"); *Glucophage Generics Should Be Addressed by Congress, OGD's Buehler Says*, The Pink Sheet (Nov. 5, 2001) (Gary Buehler, Director of FDA's Office of Generic Drugs, explained that FDA's approval process for Glucophage ANDAs "stopped … because of a problem with pediatric labeling," and "the ideal solution" was new legislation by Congress); *see also* Office of Generic Drugs, Generic Labeling 2006, Labeling Review Branch, at 8, *available at* http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ucm119206.pdf.

**3. Allowing a Carve-Out Based on the 2015 Interpretation Would Change the Treatment for Pediatric Orphan Drugs in a Way That Congress Has Not Authorized.**

The 2015 Interpretation is independently invalid and unlawful because it is contrary to the FDCA's text, structure, purposes and history.

Several features of the FDCA's text and structure indicate that Congress did not intend to grant FDA authority to carve out pediatric labeling protected by orphan drug exclusivity. To start, section 505A(*o*) is the sole statute that defines FDA's authority to carve out pediatric labeling, and thus occupies the field on that issue. *See RadLAX*, 132 S. Ct. at 2071. Because section 505A(*o*) does not provide authority to carve out pediatric labeling protected by orphan drug exclusivity, such authority does not exist. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1312 (D.C. Cir. 2004) (statutes must "be interpreted according to standard tools of statutory interpretation").

This reading is supported by the *expressio unius* canon of statutory interpretation. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *TRW Inc. v. Andrews*, 534 U.S. 19, 28–29 (2001). Because Congress expressly granted FDA authority to carve out two other types of pediatric labeling (i.e., those protected by patent and three-year Hatch-Waxman exclusivity), the text of the statute indicates that Congress elected *not* to grant FDA authority to carve out other forms of exclusivity not mentioned.

Congress would have specifically included orphan drug exclusivity in section 505A(*o*) had it intended FDA to have carve-out authority with respect to pediatric orphan labeling. Congress was not picking from an endless universe of labeling protections when it enacted section 505A(*o*). There are three such categories, two of which are specified in section 505A(*o*), and the only remaining category—orphan drug exclusivity—is not included. Similarly, had Congress intended to grant FDA carve-out authority over *all* exclusivities, it could easily have

done so by rewriting section 505A(*o*)(1) as allowing generics to "omi[t] a pediatric indication" that "is protected by ~~patent or by~~ exclusivity ~~under clause (iii) or (iv) of section 355(j)(5)(F) of this title~~." Yet Congress did not take that approach, despite having done so elsewhere in the FDCA. *See* 21 U.S.C. § 355(j)(10)(A)(i) (drug shall "be eligible for approval" if "the application is otherwise eligible for approval under this subsection but for expiration of patent, *an exclusivity period*, or of a delay in approval" (emphasis added)).

The *expressio unius* inference is further supported by the fact that Congress cross-referenced the Orphan Drug Act, 21 U.S.C. § 360cc, in *other* parts of section 505A, but elected not to in section 505A(*o*). *See* 21 U.S.C. §§ 355A(b)(1)(A)(ii), 355A(c)(1)(A)(ii).[14] This Court must presume that the disparate inclusion was intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and quotation marks omitted)).

Finally, the 2015 Interpretation is inconsistent with Congress's longstanding policy of affording broad protection for orphan drugs. The Orphan Drug Act has always provided a seven-year period of exclusivity for approved orphan drugs since its enactment 33 years ago. These provisions, including the incentives provided to drug companies to develop drugs for the treatment of rare diseases and the policy reasons for those incentives, are well-known to Congress, and apply with special force to a pediatric orphan diseases or conditions.[15] When

---

[14] These provisions were enacted as part of the Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, § 111, 111 Stat. 2296 (1997), and were amended by the Best Pharmaceuticals for Children Act, Pub. L. No. 107-109, § 19, 115 Stat. 1408 (2002)—the very same law through which section 505A(*o*) was enacted.

[15] *See* 21 U.S.C. § 360ff (rare pediatric disease priority review voucher program).

section 505A(*o*) was enacted, those policy considerations were not merely in the background, but instead were under active consideration by Congress. For example, two days after the Senate Health, Education, Labor and Pensions ("HELP") Committee held a markup of the Best Pharmaceuticals for Children Act, *see* S. Rep. No. 107-79 (2001), at 5, Senator Kennedy, Chairman of the HELP Committee, introduced a bill entitled "Rare Diseases Act of 2001," to authorize the Office of Rare Diseases at the National Institutes of Health and to increase funding for FDA's Orphan Product Research Grant program, *see* S. 1379, 107th Cong. (2001); 147 Cong. Rec. S8952 (Aug. 3, 2001). Senator Kennedy's bill underscored the need to incentivize the development of treatments for orphan diseases, and also stated that, "[d]espite the tremendous success of the [ODA], rare diseases and disorders deserve greater emphasis." S. 1379, 107th Cong., 1st Sess., at 2–4.

In short, the same Senators who enacted section 505A(*o*) knew exactly what they were doing by excluding orphan drug exclusivity from the scope of section 505A(*o*). Indeed, the legislative history reflects precisely why Congress took that approach: Congress understood the value of orphan drug exclusivity and eschewed enactment of language that would in any way diminish that protection in the case of a pediatric orphan disease or condition.

AstraZeneca's Pediatric HoFH Study shows how the incentives created by the Orphan Drug Act and FDA's pediatric-labeling regulations work in practice. Pediatric HoFH is an important public-health issue with unmet medical need. Although the market for HoFH treatment is small (due to the small number of patients), AstraZeneca invested in the Pediatric HoFH Study based in large part on the incentives created by Congress and FDA regulations. *See* Keenan Decl. ¶ 20. Without those incentives, it is not realistic to expect that a drug manufacturer would invest time and resources in investigating treatment for small pediatric patient populations. *See* Keenan

Decl. ¶ 19. Yet FDA's purported carve-out of the pediatric HoFH labeling here would remove those incentives.

### 4. The *Otsuka* Decisions Are Not Binding and Were Wrongly Decided.

Although a Maryland federal district court agreed with FDA's 2015 Interpretation in the *Otsuka* litigation, the unpublished decisions issued in that litigation are neither controlling nor persuasive.

To begin with, the *Otsuka* decisions are not binding precedent. As this Court has repeatedly recognized, "cases from outside this jurisdiction" are "nonbinding." *Girdler v. United States*, 923 F. Supp. 2d 168, 195 n.17 (D.D.C. 2013); *see also Lutes v. Goldin*, 62 F. Supp. 2d 118, 135 n.20 (D.D.C. 1999) (cases "from a district court outside this jurisdiction" have "no binding effect whatsoever on this Court").

Nor are the *Otsuka* decisions persuasive. *First*, the *Otsuka* decisions relied on an erroneous understanding of FDA's general carve-out authorities. The court asserted that "FDA's own regulations also demonstrate the authority granted by the FDCA to permit labeling changes based on the 'omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under *[the FDCA]*.'" *Otsuka I*, 2015 WL 1962240, at *8 (quoting 21 C.F.R. § 314.94(a)(8)(iv)) (emphasis added). In actuality, the quoted regulation states that FDA may carve out "an indication or other aspect of labeling protected by patent or accorded [Hatch-Waxman] exclusivity under *section 505(j)(5)(F) of the act*." 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added). Thus, contrary to the *Otsuka* court's understanding, FDA's regulations do not provide the agency with sweeping authority to carve out *all* forms of exclusivity accorded "under [the FDCA]." Instead, the regulations provide a far more limited mechanism for carving out specific forms of exclusivity under section 505(j)(5)(F) of the FDCA (codified at 21 U.S.C. § 355(j)(5)(F)). Those exclusivities do not include the one at issue here: orphan drug exclusivity

provided under 21 U.S.C. § 360cc(a).[16] *Otsuka* is therefore based on a faulty understanding of a key regulation.

*Second*, the *Otsuka* court incorrectly found that FDA routinely permits "orphan drug exclusivity carve-outs where" the branded drug had an existing "exclusivity [that] incorporated pediatric information." *Otsuka I*, 2015 WL 1962240, at *10. There is no evidence that FDA confronted the issue in the handful of examples cited by the *Otsuka* court.[17] But even if FDA had considered the issue in the examples cited by the *Otsuka* court, the fact that FDA acted unlawfully in the past does not grant it carte blanche to continue doing so in the future. *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 521 (D.C. Cir. 2015) (rejecting the notion that "Whatever is is right" (quotation marks omitted)); *see also Christopher*, 132 S. Ct. at 2166 (no deference where challenged interpretation "conflicts with a prior interpretation," such as FDA's Glucophage decision, or represents "a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack" (quotation marks omitted)).

*Third*, and finally, the *Otsuka* decision erred in its assessment of section 505A(*o*)'s text, purpose and history. The court incorrectly dismissed compelling evidence that Congress was actively considering orphan drug exclusivity when it enacted section 505A(*o*), improperly declined to apply the *expressio unius* canon of statutory interpretation, and failed to comprehend that section 505A(*o*) would have served no purpose if FDA's general carve-out regulations provided sufficient authority to carve out pediatric labeling protected by orphan drug exclusivity.

---

[16] The court repeated this error in *Otsuka II*. *See* 2015 WL 3442013, at *14.

[17] Specifically, the court relied on the approval of three generic versions of branded drugs but cited no evidence that FDA had considered the question presented here in any of those cases. *See Otsuka I*, 2015 WL 1962240, at *10 (citing Intervenor-Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order And/Or Preliminary Injunction, *Otsuka Pharm. Co. v. Burwell*, No. 8:15-cv-00852, ECF No. 82, at 27–28 (D. Md. filed Apr. 20, 2015)).

*See Otsuka II*, 2015 WL 3442013, at *7–10. The court also failed to observe the rules that specific statutes and regulations (such as section 505A(*o*) and FDA's pediatric-labeling rules) must govern over more general enactments (such as FDA's general carve-out authorities), *see RadLAX*, 132 S. Ct. at 2071, and that later-in-time regulations (such as FDA's categorically worded pediatric-labeling rules) control over earlier adopted regulations (such as FDA's general carve-out authorities) when the two conflict. *See Maceren*, 509 F.2d at 941.

### III.    AstraZeneca Will Likely Suffer Irreparable Harm in the Absence of Injunctive Relief.

Equitable relief is proper where the party seeking relief will, absent such relief, be at imminent risk of suffering immediate injury for which there is no recourse. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Courts have thus recognized that when a party shows "the imminence of irreparable injury for which there [i]s no plain, adequate and complete remedy at law," injunctive relief is proper. *Toomer v. Witsell*, 334 U.S. 385, 391–92 (1948) (finding irreparable injury where compliance with challenged provision would entail losses of "large sums of money for which [the law] provides no means of recovery" and "a substantial loss of business for which no compensation could be obtained").

Although economic loss, standing alone, ordinarily does not constitute irreparable harm, this principle *does not* apply in many cases involving federal agencies. Instead, when a party "cannot recover damages from an agency because the agency has sovereign immunity, 'any loss of income suffered by [the] plaintiff is irreparable per se.'" *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)); *see also Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004). The economic loss AstraZeneca will likely suffer in the absence of action

from this court is thus precisely the type of injury that "tip[s] the balance in favor of injunctive relief." *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (economic harm is "irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" (quotation marks omitted)).

If FDA applies its 2015 Interpretation to permit the launch of multiple generic Crestor products on or about July 9, the injury to AstraZeneca will be immediate, substantial and irreparable. Even if this court ultimately concludes that FDA's interpretation was unlawful, AstraZeneca has no right of action against FDA to recover damages occasioned by the premature ANDA approvals, nor could it seek relief from generic manufacturers who entered the market pursuant to FDA approval. *See R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 50 (D.D.C. 2011) (finding irreparable injury due to plaintiffs' "inability to recover costs from the FDA"), *injunction vacated on other grounds*, 696 F.3d 1205, 1222 (D.C. Cir. 2012); *see also Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010) (improper deprivation of exclusivity and resulting economic loss "would not be remedied by" restoration "of exclusivity later on"). The harm AstraZeneca will likely suffer in the absence of equitable relief will therefore be permanent and irreversible.[18]

---

[18] FDA may assert, as it has in prior cases, that economic loss does not constitute irreparable harm "unless the financial injury is so great as to threaten the continued existence of the movant's business." *See, e.g.*, *AstraZeneca Pharm. LP v. FDA*, No. 12-00388, ECF No. 7, at 28 (D.D.C. Mar. 15, 2012). This is a misstatement of the law. The case on which FDA relies for this proposition, *Wisconsin Gas v. FERC*, is clear that this test relates only to "recoverable" damages. 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, the D.C. Circuit has made clear that the general rule that economic harm is not irreparable, "is based upon the presumption that 'adequate compensatory or other corrective relief *will be available at a later date*, in the ordinary course of litigation.'" *Robertson v. Cartinhour*, 429 Fed. App'x 1, 3 (D.C. Cir. 2011) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)) (emphasis

There can be no question that the launch of multiple generics has an immediate, significant and adverse impact on sales of branded drugs already on the market.[19] While a single generic often has a limited effect on brand sales, the availability of *multiple* generics allows pharmacies and managed care plans to substitute generics for all branded product, and results in insurance companies rapidly placing the branded product on a less-preferred tier. Wooten Decl. ¶¶ 16–18; *see also Teva*, 595 F.3d at 1311 (premature entry of "additional firms" deprives exclusivity holder of "a valuable asset" and often "yield[s] a severe economic impact" (quotation marks omitted)); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361–62 (Fed. Cir. 2008) (price erosion due to existing generic "do[es] not negate the market share and revenue loss" occasioned by entry of additional generics). Premature entry of multiple generics into the market will thus have substantial and irreparable effects on Crestor's sales and market share.

AstraZeneca's own experiences bear out these effects, and show that brand sales erosion following generic launches is instantaneous. For example, in 2008, competitor Teva received FDA approval for generic Pulmicort. Teva immediately launched its product, and although AstraZeneca was able to secure a restraining order on the same day, Teva had already shipped nearly six months' worth of its generic product into the U.S. market. Wooten Decl. ¶ 19. AstraZeneca had the same experience following approval of generic versions of its Seroquel product in 2012, which caused Seroquel's price and market share to plummet overnight. *Id.* ¶ 20.

---

added). "That presumption *does not* hold and the general rule *does not* apply" when, as here, the plaintiff cannot recover monetary damages against the defendant. *Id.* (emphases added).

[19] *See* Fed. Trade Comm'n, Authorized Generics: Short-Term Effects and Long-Term Impact, at 66–67 (2011) (brand share six months after generic entry "is less than 20 percent, and in some cases brand share may fall even more rapidly"); Murray Aitken et al., *Prescription Drug Spending Trends in the United States: Looking Beyond the Turning Point*, 28 Health Affairs 151, 155 (2009) ("[I]n 2002 branded products retained 28 percent of their prescription volume twelve months after patent expiry. In 2007 that figure dropped to 14 percent.").

There is every reason to believe that the same course of events will transpire here without immediate injunctive relief from this Court. FDA has already tentatively approved ten ANDAs for generic rosuvastatin calcium, which are likely to receive final approval on or about July 9, 2016. *See id.* ¶¶ 7, 11–12. Upon final approval, generic manufacturers are likely to flood the market immediately with at least six months' worth of generic product, a scenario in which AstraZeneca's market share would drop precipitously, declining substantially in the first few days after generic launch, and by 80% before the end of 2016. *Id.* ¶ 15. This rapid erosion in Crestor sales would result in an irrevocable loss of approximately $400 million by December 31, 2016—damages for which, as explained above, AstraZeneca has no recourse even if it prevails in this litigation. *Id.*; *see also Teva*, 595 F.3d at 1311 (loss of exclusivity may "not be remedied by [Plaintiff's] securing . . . exclusivity later on"); *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) (granting motion for temporary restraining order blocking launch of generic because "price erosion and diminished market share can constitute irreparable harm").[20]

Premature market entry of multiple generics would immediately cause great harm to the company, and have significant and irreparable consequences beyond decreased sales. Crestor sales currently support the employment of over 1845 AstraZeneca employees in operations, marketing and sales, and a substantial loss of Crestor revenue would require AstraZeneca to eliminate a significant number of these positions. Wooten Decl. ¶ 24. Loss of Crestor revenue resulting from premature multiple generic entry would also sharply reduce AstraZeneca's capacity to invest in research and development. *Id.* ¶ 29 (loss of $400 million in revenue would

---

[20] Losses resulting from improper approval of generic rosuvastatin calcium ANDAs over the full seven-year period of AstraZeneca's pediatric orphan drug exclusivity would number in the billions. Wooten Decl. ¶ 22.

eliminate up to $100 million in R&D funding). Courts have held that these types of losses qualify as irreparable. *See Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (irreparable harm may include loss of revenue and resources for research).

An order preserving the status quo is necessary to prevent the immediate, irreversible harm that AstraZeneca will suffer if additional Crestor generics are permitted to launch prematurely under FDA's unlawful 2015 Interpretation.

### IV.    The Balance of Equities and the Public Interest Favor Granting Injunctive Relief.

FDA would not be harmed if this Court bars further generic approvals, pending a hearing on a motion for a preliminary injunction or expedited resolution of the merits. *See Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (finding that the balance of equities favored the plaintiff because "[g]ranting a preliminary injunction … will result in no discernible injury to defendants"). To the contrary, the public interest is served by a regulatory regime that faithfully adheres to the authorizing statutes. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing "an overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate"); *Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 134 (D.D.C. 2003) ("[T]he importance of complying with legal requirements … [is] among the highest public policy concerns one could articulate."). It would undermine that interest, and would greatly lessen the extent to which the public could rely on FDA's regulatory regime in the future, if AstraZeneca were unable to secure preliminary relief necessary for meaningful judicial review.

The harm AstraZeneca would suffer in the absence of a TRO also outweighs any harm to the ANDA applicants. An ANDA filer cannot complain about a delay in final approval when such approval would not be lawful. Moreover, because of the dynamic of the market for prescription drugs and the large quantities that generic manufacturers can place in the market at the instant of final approval, the damage that a generic can cause AstraZeneca by launching far

outweighs the harm to the generic from an injunction preserving the status quo until resolution of the merits. *See* Wooten Decl. ¶¶ 18–22. In short, if the Court denies the TRO, AstraZeneca stands to immediately lose six months of sales, but if the Court grants the TRO, each generic's loss of sales is limited to the timeframe it takes to resolve this matter. *See id.* ¶¶ 20–21.

The public interest would likewise be served by requiring FDA to comply with the law. *See, e.g.*, *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) ("[T]here is a strong public interest in meticulous compliance with the law by public officials."). Because AstraZeneca has shown a likelihood of success on the merits, the public interest weighs in favor of injunctive relief. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998).

In addition, the public interest favors providing AstraZeneca with a fair and reasonable opportunity to secure judicial review of the important labeling and exclusivity issues it has raised. FDA itself has underscored the important public interest in complete and accurate pediatric labeling by adopting regulations mandating that dosing, specific indications, and other data pertaining to pediatric uses "must appear in *all* prescription drug labeling." 21 C.F.R. §§ 201.57(a), (a)(6)–(7), (a)(13), (c)(2)(i)(B), (c)(3)(i)(H) (emphasis added). This is particularly important where, as here, Congress provided incentives to "promote the development of promising drugs for rare diseases and conditions that would not otherwise be developed and approved." Otsuka Letter, Ex. B, at 7. The public has a compelling interest in incentivizing research and development related to *pediatric* orphan diseases, as reflected in Congress's decision not to include pediatric labeling protected by orphan drug exclusivity in section 505A(*o*)'s carve-out provision. Those incentives are undermined if AstraZeneca is unable to secure judicial review of its entitlement to this exclusivity before that right is effectively eviscerated by FDA.

While the public also has an interest in access to generic drugs, entry of a TRO would not preclude access to generic rosuvastatin. FDA has already given final approval to Watson's generic version of Crestor. *See* Walters Decl. ¶ 4. Watson's ability to market that product will not be affected by the outcome of this case. FDA has also approved several other statin drugs (and corresponding generics), meaning that consumers will benefit from generic competition even if this Court grants preliminary relief.[21]

## CONCLUSION

For the foregoing reasons, the Court should grant a Temporary Restraining Order that bars FDA from approving generic versions of Crestor based on FDA's 2015 Interpretation until such a time that this Court can consider the merits of AstraZeneca's claim.

---

[21] Because FDA will not suffer monetary loss from an injunction, there is no requirement for a security bond pursuant to Rule 65(c). *See Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 81 (D.D.C. 2009). Further, in assessing Rule 65's security requirements, the Court looks only to the damages of the enjoined party and not the impact on third parties. *McGregor Printing Corp. v. Kemp*, No. 91-3255, 1992 WL 118794, at *7 (D.D.C. May 14, 1992).

June 30, 2016                           Respectfully submitted,


                                        ___/s/ Christopher N. Sipes_____
John M. Engel (D.C. Bar No. 443628)     Timothy C. Hester (D.C. Bar No. 370707)
ENGELNOVITT, PLLC                       Michael S. Labson (D.C. Bar No. 447867)
Suite 310                               Christopher N. Sipes (D.C. Bar No. 439294)
2401 Pennsylvania Ave. NW               COVINGTON & BURLING LLP
Washington, DC  20037                   850 Tenth Street NW
(202) 207-3303 (tel)                    Washington, DC 20001
(202) 207-3318 (fax)                    (202) 662-6000 (Telephone)
jengel@engelnovitt.com                  (202) 662-6291 (Fax)
                                        thester@cov.com
                                        mlabson@cov.com
                                        csipes@cov.com

                                        *Attorneys for Plaintiffs AstraZeneca*
                                        *Pharmaceuticals LP and*
                                        *iPR Pharmaceuticals, Inc.*